# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

| | | |
|---|---|---|
| **MOLLY DUNN McCLOUD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:06-0064** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social

Security Act, 42 U.S.C. §§ 401-433. This case is presently pending before the Court on the parties'

cross-Motions for Judgment on the Pleadings. (Doc. Nos. 18, 20.) Both parties have consented in

writing to a decision by the United States Magistrate Judge.

The Plaintiff, Molly Dunn McCloud (hereinafter referred to as "Claimant"), filed an

application for DIB on January 22, 2002, (protective filing date), alleging disability as of May 1,

1999, due to reflex sympathetic dystrophy; chronic pain in her right hand, arm, neck, shoulder, low

back, hip, and leg; fibromyalgia; muscle spasms; thyroid problems; iron deficiency anemia; edema;

loss of hearing in her left ear; depression; stress; lack of concentration; and mood swings.[1] (Tr. at

---

[1] Claimant filed a prior application for DIB on June 24, 1997. (Tr. at 44.) The claim was
denied initially and on reconsideration. (Tr. at 58-60, 63-65.) On March 9, 1998, Claimant requested
a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 66.) The hearing was held on March
3, 1999, before the Honorable Brian P. Kilbane. (Tr. at 44.) By decision dated April 27, 1999, ALJ
Kilbane determined that Claimant was not entitled to benefits. (Tr. at 44-54.) The ALJ's decision
became the final decision of the Commissioner on January 7, 2002, when the Appeals Council
denied Claimant's request for review. (Tr. at 23.) No further appeal was taken.

526, 527-29, 454, 466, 535.) The claim was denied initially and upon reconsideration. (Tr. at 454-56, 466-67.) On January 21, 2003, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 468.) The hearing was held on July 30, 2003, before the Honorable Thomas R. King. (Tr. at 825-58.) Supplemental hearings were held on February 12, 2004, and May 26, 2004, for the purpose of hearing testimony from Charles Cooke, M.D., an independent medical expert, and Charles McClung, D.O., Claimant's treating physician. (Tr. at 859-902, 903-28.) By decision dated April 24, 2004, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 23-36.) The ALJ's decision became the final decision of the Commissioner on January 11, 2006, when the Appeals Council denied Claimant's request for review. (Tr. at 15-18.) On January 30, 2006, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2004). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the

2

third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2004). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

      *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

      (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

      (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

      (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are

---

   [2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the

rating and degree and functional limitation to the criteria of the appropriate listed mental disorder

to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R.

§§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe

mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the

Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The

Regulation further specifies how the findings and conclusion reached in applying the technique must

be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because

she had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 30.) Under

the second inquiry, the ALJ found that Claimant suffered from fibromyalgia and obesity, which were

---

difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

severe impairments. (Tr. at 30.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 32.) The ALJ then found that Claimant had a residual functional capacity for sedentary work

> that would not have required her to use her dominant right hand and arm constantly or repetitively throughout the workday, lift more than 10 pounds, sit for longer than six hours or stand and walk for longer than two hours in an eight hour day.

(Tr. at 33.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 33.) On the basis of testimony of a Vocational Expert ("VE") and Medical Expert ("ME") taken at the administrative hearings, the ALJ concluded that Claimant could perform jobs such as a sales attendant and file clerk, at the sedentary level of exertion. (Tr. at 34.) On this basis, benefits were denied. (Tr. at 35-36.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on December 29, 1958, and was 43 years old when she was last insured for benefits on December 31, 2001. (Tr. at 34, 527, 830.) Claimant had an eighth grade education and a Generalized Equivalency Diploma. (Tr. at 24, 34, 541, 830.) In the past, she worked as a stock clerk, waitress, and cashier. (Tr. at 24, 548-51, 850-52, 897.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ (1) erred in not finding Claimant's Reflex Sympathetic Dystrophy Syndrome ("RSD") a severe impairment, (2) failed to give proper weight to the opinions and testimony of Claimant's treating physicians, Dr. Charles McClung, D.O., and Dr. W. Lemly; and  (3) posed an incorrect hypothetical to the VE at the administrative hearings. The Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision.

1. ALJ's Assessment of Claimant's RSD.

Claimant first argues that the ALJ erred in not finding her RSD a severe impairment. In support of her argument, Claimant asserts that the ALJ was bound by the findings of ALJ Kilbane. (Pl.'s Br. at 29-30.) Additionally, she argues that in finding her RSD a non-severe impairment, the ALJ improperly relied on Dr. Cooke's testimony, which was not based on a review of Claimant's

entire medical record. (Id. at 17-18.)

    A. Res Judicata.

The Court first addresses Claimant's argument that ALJ King was bound by ALJ Kilbane's findings with regard to the severity of Claimant's impairments. (Pl.'s Br. at 29-30.) By decision dated April 27, 1999, ALJ Kilbane found that Claimant's RSD was a severe impairment. (Tr. at 53, Finding 3.) Nevertheless, at step five of the sequential analysis, ALJ Kilbane determined that Claimant retained the capacity to adjust to other work which existed in significant numbers in the national economy and found that she was not disabled. (Tr. at 53, 54 Finding 12-13.) With regard to Claimant's instant claim, ALJ King found that Claimant's RSD was not a severe impairment. (Tr. at 30.) Claimant argues that because the ALJ "specifically incorporated by reference the decision of ALJ Kilbane and his summary of the medical evidence," it necessarily follows that ALJ King also "was bound by a finding that RSD constituted a severe impairment." (Pl.'s Br. at 30.)

In social security cases, the doctrine of res judicata applies when there has been a "previous determination or decision . . . about [the claimant's] rights on the same facts and on the same issue or issues, and this previous determination or decision has become final by either administrative or judicial action." 20 C.F.R. § 404.957(c)(1) (2004). The Social Security Administration "treats a claimant's second or successive application for disability benefits as a claim apart from those earlier filed, at least to the extent that the most recent application alleges a previously unadjudicated period of disability." Albright v. Apfel, 174 F.3d 473, 476 (4th Cir. 1999). However, "to the extent that a second or successive application seeks to relitigate a time period for which the claimant was previously found ineligible for benefits, the customary principles of preclusion (res judicata) apply with full force." Id. at 476 n.4. In Albright, the claimant's second application for benefits alleged

8

the same onset date as a prior application that was denied. See id. The Fourth Circuit noted that the second ALJ's dismissal of the claims insofar as they related to the previously adjudicated period was "entirely proper." Id.

> If an entirely new SSA claim is brought, issue preclusion will not prevent a new determination of issues decided in a previous suit. . . . This means that when a claimant brings a new claim, issues in a current claim are decided independently of the previous claim. In this context, such a previous determination has no weight in a subsequent case.

Rucker v. Shalala, 894 F.Supp. 1209, 1217-18 (S.D. Ind. 1995).

As previously noted, Claimant filed her first application for benefits on June 24, 1997, alleging disability as of December 24, 1996. (Tr. at 44.) This application was denied by ALJ Brian P. Kilbane on April 27, 1999. (Tr. at 44-54.) That decision became the final decision of the Commissioner on January 7, 2002, when the Appeals Council denied Claimant's request for review and Claimant did not further pursue her appeal. (Tr. at 23.) Claimant's current application is thus considered a new claim, relating to Claimant's condition subsequent to the prior adjudication, that is, from April 28, 1999, through her last day insured, December 31, 2001. See Albright v. Apfel, 174 F.3d at 474 ("The SSA considers these applications to be new claims, relating to Albright's condition subsequent to the prior adjudication, i.e., from May 29, 1992 onward."). The current ALJ, Thomas R. King, found the April 27, 1999, decision res judicata with respect to the period from Claimant's alleged onset date, May 1, 1999, through April 27, 1999, the date of the finally adjudicated decision. (Tr. at 24.) The Court finds that the ALJ properly applied the doctrine of res judicata. Accordingly, the relevant period at issue is from April 28, 1999, through December 31, 2001, and the Court finds that ALJ Thomas was not bound by AJL Kilbane's findings with regard to the severity of her impairments.

B. <u>Severity of RSD</u>.

The Court next addresses Claimant's argument that the ALJ erred in not finding that her RSD constituted a severe impairment. To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe. 20 C.F.R. §§ 404.1520(c); 416.920(c) (2004)." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2004); <u>see also</u> 20 C.F.R. §§ 404.1521(a); 416.921(a) (2004); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-41 (1987) (recognizing change in severity standard). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b); 416.921(b) (2004). Examples of basic work activities under those sections are:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b); 416.921(b) (2004).

As ALJ Thomas noted, Social Security Ruling 03-2p provides guidance for the development and evaluation of disability claims based on RSD. (Tr. at 31.) The Ruling defines Reflex Sympathetic Dystrophy Syndrome, or RSD, as "a chronic pain syndrome most often resulting from trauma to a single extremity[]" most commonly manifested by complaints of "intense pain and findings indicative of autonomic dysfunction at the site of the precipitating injury." SSR 03-2p, 2003 WL 22399117, *1. In determining whether RSD is a medically determinable impairment, SSR 03-2p instructs that RSD

> can be established in the presence of persistent complaints of pain that are typically out of proportion to the severity of any documented precipitant and one or more of

10

the following clinically documented signs in the affected region at any time following the documented precipitant:

- Swelling;
- Autonomic instability - seen as changes in skin color or texture, changes in sweating (decreased or excessive sweating), changes in skin temperature, and abnormal pilomotor erection (gooseflesh);
- Abnormal hair or nail growth (growth can be either too slow or too fast);
- Osteoporosis; or
- Involuntary movements of the affected region of the initial injury.

SSR 03-2p, 2003 WL 22399117, * 4.

The ALJ evaluated the evidence of record and summarized it in his decision. (Tr. at 24-29, 30-32.) Significantly, he incorporated by reference the medical evidence with regard to Claimant's first claim, which was summarized in ALJ Kilbane's April 27, 1999, decision. (Tr. at 26.) The ALJ noted that Claimant was first diagnosed with RSD early in the course of treatment by Dr. Ian D. Archibald, M.D., although radiology reports, neurological consults, and EMG studies were normal and indicated nothing more than carpal tunnel syndrome. (Tr. at 30, 197-215.) On July 22, 1992, Dr. Archibald noted some edema of Claimant's right hand and fingers in general, associated with some discoloration of the skin and changes in the temperature and moistness of the skin. (Tr. at 215.) Dr. Archibald strongly encouraged Claimant to continue working. (Id.) Thereafter, neither Dr. Archibald nor Dr. Vincent T. Basile, M.D., observed the clinical signs of RSD, including "skin discoloration, or changes in texture, moisture, temperature or pulsation." (Tr. at 30, 197-215, 184-73.) On October 26, 1992, Dr. Archibald opined that there was no longer any evidence of RSD remaining in Claimant's right hand. (Tr. at 212.) Dr. Basile noted on September 8, 1994, that Claimant's hand presented with equal color, texture, moisture, temperature, and pulses, and had full range of motion. (Tr. at 173.) He asserted that her pain was "more like a false signal than anything else," and opined that her aches were more like a migratory polymyalgia. (Id.)

11

Claimant underwent evaluations at Duke University Medical Center from December 1, 1994, through June 26, 1995. (Tr. at 186-90, 585-91.) The ALJ noted that these evaluations "essentially ruled out RSD." (Tr. at 30.) Claimant takes issue with this statement and asserts that while these doctors may have doubted Claimant's RSD diagnosis, "it was not ruled out." (Pl.'s Br. at 33.) The Court finds that Claimant's statement is correct. However, the import of the ALJ's statement was that the Duke University physicians questioned the RSD diagnosis in their evaluations. On January 30, 1995, Dr. Bruno J. Urban, M.D., of Duke University Medical Center, noted that Claimant failed to demonstrate to a substantial degree any typical stigmata of RSD and failed to respond to sympathetic blockade with respect to her symptomatology. (Tr. at 586.) Dr. Urban stated that it was "unclear whether [Claimant] had RSD prior to her initial series of blockades and what effect they had on her pain." He opined, however, that given her symptoms and nature of pain persisting through the blockade, it was unlikely that a sympathetic component to Claimant's pain problems was present. (Id.) It was noted on June 26, 1995, that Claimant's pain in her right upper extremity had improved. (Tr. at 186.)

The ALJ noted that on December 9, 1998, Dr. Rodolofo Gobunsuy conducted a consultative examination of Claimant and concluded that she did not have the typical trophic changes of her skin, hands, fingers, or nails, that were normally associated with RSD. (Tr. at 30, 420.) Dr. Gobunsuy noted that radiology reports did not demonstrate any osteoporosis or any discrepancies in the size of her upper extremities which would suggest favoring or guarding. (Id.)

The ALJ noted that Dr. W. Lemley, Claimant's treating physician from January 8, 1997, through January 21, 2002, was "skeptical and stated unambiguously that he had never seen any physical signs of the disorder, and his colleague Dr. Gunter also saw no signs whatsoever of RSD."

(Tr. at 30.) Dr. Lemley noted on January 8, 1997, a diagnosis of RSD by history. (Tr. at 666.) Throughout Dr. Lemley's treatment of Claimant's RSD, Claimant reported continued pain with only one flare up resulting in intense pain, vomiting, and unconsciousness. (Tr. at 602.) The Court notes however, that on January 21, 1999, Dr. Lemley noted Claimant's prior complaints of edema and tenderness, and opined that although there were no skin coloration changes and osteoporosis, Claimant had mild RSD. (Tr. at 434.) He further opined that "these changes would not necessar[il]y have to be present with a diagnosis of stage one RSD." (Id.)

Dr. Charles McClung, D.O., Claimant's current treating physician, first examined her on February 22, 2002. (Tr. at 30, 726.) As the ALJ noted, this treatment was rendered subsequent to the expiration of Claimant's insured status. (Tr. at 30-31.) Dr. McClung opined retrospectively that Claimant's RSD condition was disabling prior to December 31, 2001, based on a review of Dr. Lemley's records. (Tr. at 31, 770-71, 908.) As previously discussed, however, Dr. Lemley's records, at best, indicate only mild RSD. At the May 26, 2004, supplemental hearing, Dr. McClung testified that Claimant was extremely sensitive to pin prick, had some muscle wasting with weakened hand grip, exhibited a guarded posture, and held her right arm still and close to her body. (Tr. at 912-13.) He further testified that Claimant had loss of hair growth and cool skin texture, and that he had observed muscle spasms. (Tr. at 916-17, 919.) Although Dr. McClung noted that Claimant had characteristics of fibromyalgia in her right upper extremity, neck, and back, he opined that as a causative factor of Claimant's symptoms, he had no doubt that Claimant suffered from RSD. (Tr. at 917, 925.) However, Dr. McClung opined that Claimant's RSD condition was stable and had not significantly or rapidly progressed. (Tr. at 915-16, 921.) Most significantly, Dr. McClung testified that Claimant's RSD was not a disabling condition.

13

> In her 13 years now since her injury she hasn't had that rapidly progressing type of illness that a lot of people do have that is totally disabling so there is no way of predicting if she's going to get any better or worse[.]"

(Tr. at 921.) Nevertheless, Dr. McClung opined that the RSD limited Claimant's ability to perform work-related activities. (Tr. at 761-64, 917-19.)

Finally, ALJ Thomas noted that the medical expert, Dr. Cooke agreed with the physicians from Duke University that RSD did not "fit" Claimant's symptoms. (Tr. at 25, 886.) Dr. Cooke opined that by May 2000, Claimant had mild residuals of RSD but little restriction of right shoulder motion. (Tr. at 25.) Dr. Cooke acknowledged the prior diagnoses of RSD by various physicians but noted that there was little documented evidence to support them. (Tr. at 891-92.) Additionally, as the ALJ noted, Claimant's treating physician, Dr. Lemley, indicated that the condition was only mild. (Tr. at 891-94.) Dr. Cooke opined that her symptoms were most likely attributable to fibromyalgia. (Tr. at 887.)

Based on the foregoing, the Court finds that the ALJ's finding that Claimant's RSD was not a severe impairment is supported by substantial evidence of record. While Claimant may have exhibited at least, minimal signs of RSD at differing times throughout her years of treatment, there is no evidence that any physician observed the clinical signs during the period at issue. Assuming that Claimant's RSD was a severe condition, the Court further finds that the ALJ's error was harmless because both Claimant's treating physicians, Drs. Lemley and McClung, opined that her RSD was only mild and at stage one. Most significantly, however, was Dr. McClung's testimony that Claimant's RSD was not disabling. Accordingly, the Court finds that Claimant's argument is without merit and that substantial evidence supports the ALJ's decision.

C. <u>Medical Records Provided to Medical Expert Dr. Charles Cooke</u>.

Claimant next argues that in determining that Claimant's RSD was not a severe impairment, the ALJ erred in relying on the testimony of the medical expert, Dr. Charles Cooke, M.D. (Pl.'s Br. at 16-21.) Claimant asserts that Dr. Cooke was not provided with medical records associated with her June 24, 1997, claim. (Pl.'s Br. at 17.) Rather, she asserts that Dr. Cooke only reviewed and evaluated the medical records submitted with regard to her instant claim. (<u>Id.</u>) Claimant argues that the lack of information eroded "his opinion because he did not have a complete picture of [Claimant's] treatment; he had no idea how frequently she had been diagnosed with RSD." (<u>Id.</u>) The Commissioner asserts that Dr. Cooke summarized and reviewed all the exhibits submitted prior to the administrative hearing with regard to Claimant's instant claim, Exhibits B1-F through B17-F, although only two exhibits, B3-F and B5-F, relate to the relevant period at issue. (Def.'s Br. at 12.) Given that "this is a date last insured case with an unadjudicated period of April 1999 through December 2001.", Commissioner therefore asserts that Dr. Cooke considered all relevant evidence and the ALJ was entitled to rely on his opinions. (<u>Id.</u>)

As previously discussed, the Court agrees with the Commissioner and finds that the relevant period at issue is from April 28, 1999, through December 31, 2001. Claimant argues, however, that Dr. Cooke should have been provided with all Claimant's medical records to obtain a complete history of the progression of her RSD. (Pl.'s Br. at 17.) "In cases in which [RSD] is alleged, longitudinal clinical records reflecting ongoing medical evaluation and treatment from the individual's medical sources, especially treating sources, are extremely helpful in documenting the presence of any medical signs, symptoms and laboratory findings." SSR 03-2p This Ruling further instructs that "evidence of the 12-month period preceding the month of application should be

obtained, unless there is reason to believe that development of an earlier period is necessary, the alleged onset of disability is less than 12 months before the date of the application, or a fully favorable determination can be made with less evidence." Id.

It is clear that the medical evidence submitted to Dr. Cooke with regard to the instant claim covered a broad time frame from 1995 through 2004. Thus, Dr. Cooke reviewed and considered medical records for more than three years prior, and three years subsequent to the relevant period at issue. The  records reviewed by Dr. Cooke contained most of the records from Duke University and from her treating physician, Dr. Lemley. While the earlier records would have provided the medical expert with a complete history of Claimant's symptoms and pains, as discussed above, the medical records associated with either claim do not support a finding of a severe RSD impairment from April 28, 1999, through December 31, 2001. Thus, the ALJ's reliance upon Dr. Cooke's testimony was not misplaced for these reasons.

2. Treating Source Opinions.

Claimant next argues that the ALJ erred in according limited weight to the opinion of her treating physician Dr. McClung, in ignoring the opinion of Claimant's former treating physician, Dr. Lemley, and in according significant weight to the testimony of the medical expert, Dr. Cooke, and the state agency assessments. (Pl.'s Br. at 32-35.) The Commissioner asserts that Dr. Cooke's opinion and the opinions of the stage agency physicians were consistent with the clinical findings of record. (Def.'s Br. at 14.) Nevertheless, the Commissioner notes that the ALJ gave Claimant the benefit of doubt and reduced his RFC assessment from light work, as indicated by Dr. Cooke and the state agency assessments, to sedentary work. (Id. at 15.) Additionally, the Commissioner asserts that the AJL's assignment of greater weight to the opinions of Dr. Cooke than to Dr. McClung were

16

justified because Dr. Cooke observed Claimant's behavior at the administrative hearing, was more of a specialist and had more experience with RSD, analyzed Claimant's symptoms in a manner consistent with SSR 03-2p, and provided detail in his explanations. (Id. at 16.)

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d), 416.927(d). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2), 416.927(d)(2).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine

17

whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527, 416.927. These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2), 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2)  provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given.  Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4), and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

In his decision, the ALJ noted that Dr. Lemley opined that he never observed any of the physical signs of RSD. (Tr. at 30.) Nevertheless, Dr. Lemley continued to treat Claimant symptomatically as if she had RSD. (Id.) The Court notes that the ALJ failed to mention specifically Dr. Lemley's physical assessment of Claimant's ability to do work-related activities. (Tr. at 316-20.) This assessment however, was not submitted in association with Claimant's instant claim. Rather, the assessment was submitted with regard to Claimant's initial claim. The Court thus finds no error in the ALJ's failure to review and consider specifically Dr. Lemley's assessment. Nevertheless, the Court finds Dr. Lemley's assessment in part, consistent with the ALJ's RFC assessment. Dr. Lemley opined on July 10, 1998, that Claimant's physical condition limited him to lifting and carrying less than or equal to twenty pounds but did not affect his ability to sit, stand, or walk. (Tr. at 316-17.) Dr. Lemley further opined that Claimant's manipulative abilities were limited by his condition, that he could occasionally climb and that he could never crawl, push, or pull. (Tr. at 317.) He also concluded that Claimant should avoid exposure to temperature extremes and vibration. (Tr. at 318.) Despite these relatively mild limitations, Dr. Lemley nevertheless opined that Claimant was limited to performing work at less than a sedentary exertional level. (Tr. at 319.) Dr. Lemley's ultimate conclusion was therefore, inconsistent with his individually assessed limitations.

In a Physical Medical Assessment of Ability to do Work-Related Activities form, dated January 6, 2003, Dr. McClung opined that Claimant was limited to lifting and carrying less than ten pounds occasionally; standing, walking, and sitting less than two hours out of an eight-hour workday; occasionally balancing; and never climbing, stooping, crouching, kneeling, crawling, and squatting. (Tr. at 761-63.) He further opined that Claimant was unable to work more than three days a month. (Tr. at 764.) Dr. McClung also completed a form Mental Medical Assessment of Ability

to do Work-Related Activities, dated October 24, 2002, in which he opined that Claimant experienced moderate limitations in her ability to perform activities of daily living, slight limitations in social functioning, often limitations in concentration, persistence, or pace, and continual episodes of decompensation. (Tr. at 769.) He noted that she had poor memory, appetite, and sleep, as well as mood and emotional disturbances. (Tr. at 766.)

As discussed above, Dr. McClung testified at the second supplemental administrative hearing that he observed and noted that Claimant had the clinical signs of RSD and had no doubt that Claimant suffered from RSD. (Tr. at 900-26.) He noted that Claimant possessed characteristics of fibromyalgia in her right upper extremity, neck, and back, but that as a causative factor, RSD was involved. (Tr. at 917.) However, Dr. McClung opined that Claimant's RSD had not rapidly progressed, had remained rather stable without significant improvement, and that her condition was only mild to moderate in severity. (Tr. at 915-17.) In support of the ALJ's ultimate finding of non-severity, Dr. McClung opined that Claimant's RSD was not "totally disabling." (Tr. at 921.)

As also discussed above, at the first supplemental administrative hearing, Dr. Cooke, medical expert, testified that Claimant's symptoms were not characteristic of the natural history of RSD and most likely were attributed to fibromyalgia, as Claimant was also diagnosed. (Tr. at 886-96.) He acknowledged the several diagnoses of RSD since 1992, but noted that Claimant had no response to ganglion nerve blocks and that a response was typically expected with RSD. (Tr. at 887.) Although Claimant initially responded well to the nerve blocks, later attempts were unsuccessful. He also noted that Claimant had no demonstrated atrophy or restriction in ranges of motion as were also factors characteristic of RSD. (Tr. at 886.) Dr. Cooke noted that Claimant did not guard her right arm as would someone with RSD and that she rubbed her arm throughout the hearing. (Tr. at

887.) He noted that Claimant was diagnosed with mild carpal tunnel syndrome on the right, as confirmed by EMG studies, and that she had mild residuals of RSD with little restriction of right shoulder motion. (Id.)  Dr. Cooke agreed with the physicians from Duke University that while Claimant may have some symptoms typically associated with RSD, there was no convincing and overwhelming evidence to support the diagnosis. (Tr. at 890.)

The ALJ found that Dr. McClung's opinion was only retrospective and was unsupported by the clinical findings of Dr. Lemley, upon whose records Dr. McClung purportedly based his opinion. (Tr. at 33.) Dr. Cooke's opinions were consistent with those of the Duke University physicians and the treatment notes of Dr. Lemley which do not contain significant evidence of RSD. Dr. Cooke observed Claimant during the hearing both listening to testimony and offering her testimony, noting that she did not carry herself and guard her right arm as someone would with RSD. As will be discussed below, Dr. McClung's assessments of ability to perform work-related activities were not consistent with the medical evidence and Claimant's testimony as to her abilities. The ALJ thus found that although Dr. McClung was Claimant's treating physician, his opinions did not support a finding of disability or lend any support as to Claimant's limitations during the relevant period at issue. The ALJ's RFC assessment was consistent with the records and opinions from Duke University, Dr. Lemley, and the state agency physician assessments of record. (Tr. at 186-90, 585-91, 599-673, 674-81, 739-46.) Finally, the Court finds that Dr. McClung's opinions as to Claimant's inability to work are not entitled to any weight. See 20 C.F.R. § 404.1527(e)(1)-(3); 416.927(e)(1)-(3) (2004) (stating that a statement by a medical source that you are "disabled" or "unable to work" is an opinion on an issue reserved to the Commissioner, the source of which is not entitled to any special significance). Accordingly, based upon the foregoing, the Court finds Claimant's argument

without merit and that the ALJ's decision is supported by substantial evidence.

3. <u>Residual Functional Capacity</u>.

To the extent that Claimant's arguments can be construed as a challenge to the ALJ's RFC assessment, the Court finds them without merit. At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a); 416.945(a) (2004). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." <u>Id.</u> "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." <u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. <u>See</u> 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2)(2004).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

<u>Diaz v. Chater</u>, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted). Although medical source opinions are considered in evaluating an individual's residual functional capacity, the final

responsibility for determining a claimant's RFC is reserved to the Commissioner. See 20 C.F.R. § 404.1527(e)(2) (2004). In determining disability, the ALJ must consider the medical source opinions "together with the rest of the relevant evidence we receive." Id. § 404.1527(b).

The ALJ determined, despite Claimant's severe impairments of fibromyalgia and obesity, that she could perform sedentary work. (Tr. at 33, 35.) The ALJ specifically found that Claimant could perform sedentary work which would not require her to use her right, dominant hand and arm constantly or repetitively throughout the workday. (Id.) Additionally, the ALJ precluded Claimant from lifting more than ten pounds, sitting in excess of six hours, or standing and walking in excess of two hours in an eight-hour workday. (Id.) The ALJ acknowledged Claimant's testimony that she could sit five to fifteen minutes and could stand or walk ten to fifteen minutes. (Tr. at 24, 839.) Although Dr. McClung prescribed a handicap sticker, he did not treat Claimant until February 22, 2002, after her insured status had expired. (Tr. at 726, 771.) The ALJ noted that the record prior to the expiration of her insured status contained no RFC assessment more limiting than his assessment. (Tr. at 33.) The record demonstrates that at least four physical RFC assessments were completed prior to the expiration of Claimant's insured status, and that all four assessments limited Claimant to performing work at the light exertional level. (Tr. at 268, 288-95, 306-13, 316-20.) Most significantly, Claimant's treating physician, Dr. Lemley, opined on July 10, 1998, that Claimant's ability to sit, stand, and walk was not affected by her impairments. (Tr. at 316-20.) Dr. Lemley opined that Claimant could not lift in excess of 20 pounds and that her manipulative abilities were limited by her condition. (Tr. at 316-17.) The ALJ's RFC assessment was also consistent, and in some respects, less restrictive than the two physical RFC assessments completed after Claimant's insured status expired. (Tr. at 674-81, 739-46.) The ALJ, however, did not accord much, if any,

23

weight to these assessments and to the assessment of Dr. McClung, as they were assessed after Claimant's insured status had expired. Although Claimant argues that she cannot use her right hand for any activity, the record does not support her assertion. At the administrative hearing, Claimant testified that she could use her right hand to write, lift, bathe, load laundry, and use it as a support/helper hand (Tr. at 835-36, 837, 867.)

The Court agrees with the Commissioner that the medical evidence and Claimant's own statements support the ALJ's RFC assessment. The ALJ properly evaluated and considered all the evidence of record in making a determination of Claimant's RFC. The Court finds, based upon the record in the instant case, that the ALJ's RFC determination was proper and in accordance with the applicable law and Regulations. The ALJ's finding that Claimant could perform sedentary work is therefore supported by substantial evidence.

4. Step Five - Hypothetical Question.

Finally, Claimant asserts that the ALJ's hypothetical question to the VE was improper because it failed to include all of Claimant's impairments, specifically with regard to her right arm, mental limitations, and obesity. (Pl.'s Br. at 28-29.) The Commissioner asserts that this argument is without merit.

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational

24

expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. See Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

In his hypothetical questions to the VE, the ALJ included all of Claimant's impairments that were supported by the record. The ALJ first asked whether a person of Claimant's age, education, past relevant work experience, and residual functional capacity, who could not perform repetitive work with her dominant arm could perform other jobs. (Tr. at 852.) In response to the ALJ's hypothetical, the VE responded that such person could perform the jobs of sales attendant in retail trade and file clerk. (Id.) In his third hypothetical question to the VE, the ALJ asked whether a person of Claimant's age, education, past relevant work experience, and residual functional capacity, who was depressed and could not work on a regular basis, and who could neither concentrate on simple, unskilled tasks, nor work eight hours a day, five days a week could perform other jobs. (Tr. at 853.) The VE responded that depression was a matter of degree. (Id.) In response to questioning by Claimant's attorney, the VE essentially testified that assuming Dr. McClung's assessment was valid, there were no other jobs Claimant could perform. (Tr. at 855-57.) At a subsequent hearing, the ALJ asked the VE whether a person of Claimant's age, education, past relevant work experience, and residual functional capacity for sedentary work, who could not perform constant, repetitive motion with her dominant arm and who could not work around dangerous machinery could perform other jobs. (Tr. at 897.) In response to the VE's hypothetical, the VE responded that such person could perform the job of cashier and an investigative clerical job. (Tr. at 898.) Upon the ALJ's

25

changing the residual functional capacity to light exertional work, the VE responded that such a person could perform the jobs of sales attendant in a retail business and interviewer. (Id.) In response to questioning by Claimant's attorney, the VE testified that the need to lie down at unpredictable times would preclude the jobs identified. (Tr. at 899.)

As the Commissioner notes, there is no evidence that Claimant had such an extreme limitation on her ability to use her right hand and arm. As discussed above, Claimant testified that she was able to use her right arm and hand to write, lift, bathe, load laundry, and as a support/helper hand (Tr. at 835-36, 837, 867.) With regard to Claimant's mental impairments, the ALJ discounted Dr. Steinhoff's and Dr. McClung's assessments because they occurred one year after the expiration of Claimant's insured status. (Tr. at 32.) Finally, with regard to Claimant's obesity, the ALJ specifically noted SSR 02-1p in evaluating the severity of Claimant's obesity. (Tr. at 32.) Claimant has not identified any particular limitation resulting from her obesity and the Court finds no specific restriction more severe than those identified by the ALJ. Accordingly, the Court finds that the hypothetical questions were proper and the ALJ's decision is supported by substantial evidence.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Remand (Doc. No. 18.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Doc. No. 20.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

26

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 28, 2007.

R. Clarke VanDervort
United States Magistrate Judge